# Exhibit 1

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| TOBIAS MOELLER-BERTRAM, individually, and on behalf of all others similarly situated, | ) ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| GEMINI TRUST COMPANY, LLC; and DIGITAL CURRENCY GROUP, INC. | ) ) ) |
| | ) |
| Defendants. | ) ) ) |

Index No. _____

<u>CLASS ACTION</u>

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

<u>JURY TRIAL DEMANDED</u>

Plaintiff Tobias Moeller-Bertram, by and through his undersigned counsel, alleges the following against Defendants Gemini Trust Company, LLC ("Gemini") and Digital Currency Group, Inc. ("DCG"). Plaintiff bases his allegations upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, counsel's investigation, which included: review and analysis of press releases, newsletters and other communications issued and disseminated by Defendants; media reports concerning Defendants; court filings in other litigation proceedings commenced against Defendants, including by the Securities and Exchange Commission ("SEC"); and other public information concerning Defendants.

<u>**NATURE OF ACTION**</u>

1.      Plaintiff brings this class action (the "Action") against Defendants under Sections 5, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e, 77l, and 77o. This Action is brought on behalf of all investors ("Class") who invested in securities offered by

Defendant Gemini through the so-called "Gemini Earn" program ("Offering") conducted between approximately February 2021 and November 2022 (the "Class Period").

2.      The Securities Act requires any security that is offered or sold to be registered with the SEC. The legislative purpose is to protect the public by requiring various disclosures so that investors can better understand the security that is being offered or sold. Under Section 2(a)(1) of the Securities Act (15 U.S.C. § 77b(a)(1)), a "security" is defined to include a "note" and an "investment contract."

3.      Between February 2021 and November 2022, Defendants engaged in an unregistered offer and sale of securities to U.S. retail investors, in violation of the Securities Act. Through the "Gemini Earn" program, investors tendered crypto assets to non-party Genesis Global Capital, LLC ("Genesis"). In exchange, Genesis promised to pay interest on those assets to investors. Through this unregistered offering, Defendants raised billions of dollars of crypto assets, principally from U.S. retail investors.

4.      Under the Gemini Earn program, Genesis and Gemini required Gemini Earn investors to enter into a tri-party Master Digital Asset Loan Agreement with Genesis and Gemini ("Gemini Earn Agreement"). Under this agreement, Gemini provided retail investors with access to Genesis, which otherwise only engaged in crypto asset transactions with large institutional and other accredited investors.[1] Gemini Earn investors provided crypto assets to Genesis, with Gemini acting as the agent in the issuance.

5.      Genesis was the issuer and entity that received, pooled, deployed, and paid interest on investors' assets. Genesis pooled the crypto assets from Gemini Earn investors with assets from

---

[1]      "Accredited investors" are those persons whose financial sophistication and ability to sustain the risk of loss of investment render the protections of the Securities Act's registration process unnecessary. *See* Rule 501(a) of the Securities Act, 17 C.F.R. § 230.501(a).

Case 1:23-cv-02027-LJL Document 25-1 Filed 04/07/23 Page 4 of 29

other investors and then deployed the crypto assets, primarily by lending the crypto assets to institutional counterparties ("Institutional Borrowers"). Genesis earned revenue by lending the crypto assets at a higher rate than it paid to Gemini Earn and other investors. Genesis would send interest payments to Gemini, which would then deduct an "Agent Fee" before distributing the remainder of the interest payments to Gemini Earn investors.

6.    Both Gemini and Genesis marketed the Gemini Earn program through social media and Gemini's website, touting the high interest rates that investors could earn through Gemini Earn. Gemini and Genesis both profited from the partnership and Offering.

7.    The Gemini Earn Agreements, as offered and sold through the Gemini Earn program, were securities that Genesis and Gemini offered and sold to the investing public.

8.    However, the Gemini Earn Agreements in which Plaintiff and the Class invested were neither registered as required under the Securities Act, nor subject to any exemption from registration. As a result, investors lacked material information about the Gemini Earn program that would have been relevant to their investment decisions.

9.    The U.S. retail investors who participated in the Gemini Earn program have suffered significant harm. In November 2022, Genesis unilaterally announced that it would not allow hundreds of thousands of retail investors to withdraw their crypto assets from the Gemini Earn program because of "withdrawal requests which have exceeded our current liquidity" following volatility in the crypto asset market. At the time, Genesis held approximately $900 million in investor assets from approximately 340,000 Gemini Earn investors, most of whom reside in the United States. On January 20, 2023, Genesis filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code, imperiling the investment funds of the putative Class.

10.     Defendants, as persons who offered the Gemini Earn Agreements, or who controlled persons who did so, violated the Securities Act and are liable to Plaintiff and the Class for rescission of their purchases, or for damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 5, 12 and 15 of the Securities Act (15 U.S.C. §§ 77e, 77l, and 77o). This Court has original subject matter jurisdiction of the claims in this Action under the New York Constitution, Article VI, § 7(a), and Section 22 of the Securities Act (15 U.S.C. § 77v). Under Section 22 of the Securities Act, this Court has concurrent jurisdiction with the federal courts with respect to claims brought under the Securities Act, and any action asserting such claims that is brought in a state court of competent jurisdiction may not be removed to federal court.

12.     This Court has personal jurisdiction over each Defendant named herein under N.Y. C.P.L.R. §§ 301 and 302.

13.     Venue is proper in New York County pursuant to N.Y. C.P.L.R. § 503 because one or more of the Defendants resides in New York County, and because a substantial part of the events giving rise to the claims in this Action occurred in New York County.

## PARTIES

14.     Plaintiff Moeller-Bertram is an individual who invested in the Gemini Earn program.

15.     Defendant Gemini Trust Company, LLC is a New York limited liability trust company founded in 2014. Gemini is beneficially owned and controlled by Cameron and Tyler Winklevoss through Winklevoss Capital Fund, LLC. Gemini's principal place of business is in New York, New York. Gemini is registered as a New York limited purpose trust company with the New York State Department of Financial Services ("NYSDFS").

Case 1:23-cv-02027-LJL   Document 25-1   Filed 04/07/23   Page 6 of 29

16.     Defendant Digital Currency Group, Inc. is a corporation formed and existing under and pursuant to the laws of Delaware. DCG currently maintains its principal place of business in Stamford, Connecticut. DCG maintained its principal place of business in New York, New York prior to moving it to Stamford, Connecticut.

17.     Non-party Genesis Global Capital, LLC is a Delaware limited liability company formed in 2017 and a wholly owned subsidiary of Genesis Global Holdco, LLC, which in turn is wholly owned by DCG. Genesis's principal place of business is in Jersey City, New Jersey. Genesis is registered with the Financial Crimes Enforcement Network ("FinCEN") as a money services business (*i.e.*, money transmitter). Genesis is the issuer of securities under the Gemini Earn program.

## SUBSTANTIVE ALLEGATIONS

## I.     THE OFFERING OF GEMINI EARN INVESTMENTS

18.     In March 2018, non-party Genesis began obtaining crypto assets[2] from large institutional and other accredited investors in exchange for a promise to pay interest on those investors' crypto assets. Genesis used these crypto assets to lend to Institutional Borrowers, generating interest revenue. Genesis earned a profit by lending the crypto assets to Institutional Borrowers at a higher rate than it paid to its investors. Genesis pooled the investors' crypto assets and exercised discretion over how to deploy the assets to earn income.

19.     Eventually, Genesis expanded its business model to transact with not just institutional and accredited investors, but also retail investors. In particular, in December 2020,

---

[2]     The term "crypto asset" generally refers to an asset that is issued and transferred using distributed ledger or blockchain technology, including, but not limited to, so-called "cryptocurrencies," "coins," and "tokens." A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages. The system relies on cryptographic techniques for secure recording of transactions.

Genesis entered into an agreement with Gemini to offer Gemini customers, including U.S. retail investors, an opportunity to tender their crypto assets to Genesis in exchange for Genesis's promise to pay interest.

20. Commencing in February 2021, Genesis and Gemini began offering the Gemini Earn program to retail investors in the United States and Hong Kong, and later, investors in Singapore. There was no minimum investment amount to be eligible to participate in the Gemini Earn program. As of November 16, 2022, approximately 340,000 retail investors, most residing in the United States, had crypto assets invested with Genesis through the Gemini Earn program. By November 2022, the value of retail investors' crypto assets held by Gemini exceeded the collective value of those tendered by institutional and accredited investors.

21. Each Gemini Earn investor entered into a tri-party Gemini Earn Agreement with Gemini and Genesis. The agreement was a standard agreement and not individually negotiated with Gemini Earn investors. Under the terms of the Gemini Earn Agreement, Gemini Earn investors first needed to hold eligible crypto assets with Gemini – either by transferring the crypto assets to Gemini or acquiring them via Gemini's crypto asset trading platform. Through Gemini Earn, investors then tendered their crypto assets to Genesis, with Gemini acting as the agent for retail investors to facilitate the transaction. Gemini aggregated the crypto assets to be invested in the Gemini Earn program and placed them in a digital wallet. Genesis then took possession of the crypto assets in this digital wallet.

22. Genesis determined the types and aggregate amount of each crypto asset that were eligible to be invested by Gemini Earn investors. Genesis offered and agreed to pay the Gemini Earn investors in-kind interest on the crypto assets they had invested, which accrued on a daily basis. On a monthly basis, Genesis could unilaterally revise the interest rates and the aggregate

amount of each crypto asset that Gemini Earn investors could invest. In this manner, Genesis had sole discretion over the gross interest rate that it paid for each crypto asset.

23.     The returns that Gemini Earn investors earned came from Genesis, with Gemini deducting an Agent Fee from the returns. Gemini had sole discretion over its Agent Fee and thus the net rates of return offered to Gemini Earn investors.

24.     Gemini published the list of crypto assets eligible for investment and the interest rates offered to Gemini Earn investors on its website as well as in Gemini's mobile application. More than 50 crypto assets were eligible to be invested in the Gemini Earn program, including Bitcoin, Ether, USD Coin, and Dogecoin.

25.     As of October 2022, the net interest rate offered to Gemini Earn investors ranged from 0.45% to 8.05%, while Gemini's Agent Fee ranged from 0.06% to 4.29%, depending on the type of crypto asset tendered to Genesis. For the three months ended March 31, 2022, Gemini received approximately $2.7 million in Agent Fees from the Gemini Earn program.

26.     The Gemini Earn Agreement provided that the crypto asset transactions were "open term" unless otherwise specified, and Gemini Earn investors could terminate all, or a portion, of their investment in Gemini Earn at any time with no withdrawal fee. Under the Gemini Earn Agreement, Genesis was also obligated to return the invested crypto assets within three business days of an investor's request for repayment to a digital wallet controlled by Gemini, and Gemini would then transfer the crypto assets and any accrued interest to the investor's Gemini account where the assets and interest would be available for withdrawal. The Gemini Earn Agreement also provided that Genesis was responsible for repaying the crypto assets and all accrued interest to the Gemini Earn investors.

## II.    GEMINI AND GENESIS SOLICITED INVESTMENTS IN THE GEMINI EARN PROGRAM

27.    Genesis and Gemini both touted the profits investors could earn by investing their crypto assets with Genesis through the Gemini Earn program.

28.    In numerous communications, Gemini promoted the profit that investors could earn through the Gemini Earn program, and described the opportunity as an investment.

29.    For example, in a February 2021 press release launching Gemini Earn, Gemini CEO Tyler Winklevoss stated, "We designed a program that allows our customers the ability to generate a real return on their crypto holdings."

30.    On February 27, 2021, Gemini also posted a video on YouTube titled, "Invest Better with Gemini Earn."

31.    On its website, Gemini described how users would earn interest, noting, "We are excited to launch Gemini Earn and offer more opportunities for you to grow your portfolio and earn yield." Similarly, Gemini advertised on its website that investors could "[p]ut your crypto to work. With Gemini Earn, you can receive up to 8.05% APY on your cryptocurrency," and listed the interest rate that investors could earn for each eligible crypto asset.

32.    Gemini also published tweets on Twitter, including on May 26, 2021, promoting the high interest rates offered via Gemini Earn, with statements such as the following:



> **Gemini** ✔
> @Gemini                                    ···
>
> You can now earn up to 7.4% APY on your Gemini dollars $GUSD with #GeminiEarn! That's more than 100 times the national U.S. average. GUSD is a 1:1 USD-backed stablecoin that can always be bought and sold for exactly $1 at Gemini.

33.     Gemini repeatedly described Gemini Earn as an investment on its website. For example, in an FAQ entitled, "What are the risks of Gemini Earn?", Gemini included this description:

> Cryptocurrency, like many assets, can be volatile and subject to price swings. There is always a risk in ***investing***, and each customer needs to assess their own risk tolerance before making any ***investment decisions***. Our partners in Gemini Earn have an obligation to return funds according to the terms of their loan agreement. However, Gemini Earn customers (the lenders) always assume some level of risk when they decide to lend their funds. We believe Gemini Earn gives our retail investors another way to stay long-term in the asset class and have the ***option to invest and earn interest***, all on the Gemini platform.

(emphasis added).

34.     Gemini's website also claimed that Gemini Earn investors could "receive more than 100x the average national interest rate, among the highest rates on the market" and that Gemini Earn "offer[s] more flexibility than other yield-generating cryptocurrency investments."

35.     Additionally, Gemini's website featured a calculator that allowed a user to select a deposit amount, crypto asset type, and a time frame to see how much interest could be earned by tendering crypto assets through Gemini Earn. The calculator would reveal the projected amount of interest that could be earned by investing the investor's crypto assets for a period between one and four years.

36.     Genesis similarly advertised on its public website that "[h]olders of digital currencies can earn yield on their assets by lending directly to Genesis." Genesis also published tweets on Twitter highlighting its partnership with Gemini and the yield that Gemini Earn investors could earn. For example, on February 2, 2021, Genesis published a tweet stating, "Genesis is dedicated to building and partnering to lower barriers to digital asset markets."

III.     **GENESIS'S DEPLOYMENT OF THE CRYPTO ASSETS INVESTED UNDER THE GEMININ EARN PROGRAM**

37.     Genesis pooled on its balance sheet the crypto assets that it received from the Gemini Earn investors and other investors, and in practice did not segregate the crypto assets it received from different groups of investors. Genesis retained possession and control over the investors' crypto assets on its balance sheet, and determined how much to hold, lend out to others, and otherwise use the assets. Genesis exercised its discretion over how to use investors' crypto assets to generate revenue for its business and to pay the interest rates it promised Gemini Earn investors and other investors. The Gemini Earn Agreement did not contain any explicit terms restricting how investors' crypto assets would be used by Genesis.

38.     Generally, Genesis deployed the Gemini Earn investors' crypto assets by either lending them to Institutional Borrowers or using the assets as collateral for Genesis's own borrowing. Crypto assets not loaned to Institutional Borrowers or used for collateral were held by Genesis on its balance sheet in order to provide Genesis with liquidity to meet potential demand for loans as well as to repay the investors in its crypto asset program, including Gemini Earn. Genesis also had the ability to loan the crypto assets to related parties, including its parent company, DCG (as described further below, ¶¶ 82-83).

39.     When deploying the crypto assets from Gemini Earn investors, Genesis employed its discretion and judgment in determining the terms of its loans to Institutional Borrowers. For example, Genesis conducted due diligence on the Institutional Borrowers before entering into a transaction. Genesis negotiated an initial agreement with each Institutional Borrower, and then individually negotiated the terms (including the type of crypto assets to be lent, interest rate, duration of the loan, and collateral, if any) of every subsequent lending transaction. Genesis

separately evaluated each Institutional Borrower, as well as market conditions, when determining collateral rates.

40.     In this manner, Gemini Earn investors relied on Genesis's skill and expertise in pooling the invested crypto assets and deploying those assets, including Genesis's evaluation of the Institutional Borrowers, negotiation of favorable terms, and management of market and counterparty risk. When Genesis loaned crypto assets it received through the Gemini Earn program, the assets were transferred to the Institutional Borrowers and left Genesis's balance sheet. Ultimately, the returns of Gemini Earn investors were dependent on Genesis's managerial efforts and risk management in its lending activities.

41.     The interest income that Genesis received from lending crypto assets to Institutional Borrowers was used to generate revenue for Genesis and to pay the promised interest to Gemini Earn investors and other investors. Genesis did not have any other revenue-generating activities. For example, for the three months ended March 31, 2022, Genesis received approximately $169.8 million in interest income from Institutional Borrowers and paid $166.2 million in interest to the investors in its crypto asset program, including Gemini Earn.

## IV.    THE GEMINI EARN PROGRAM CONSTITUTED AN OFFER AND SALE OF SECURITIES UNDER THE SECURITIES ACT

### A.    Applicable Statutory And Regulatory Framework

42.     Under the Securities Act, Congress enacted a legal framework mandating that persons who offer and sell securities to the investing public provide sufficient and accurate information to allow investors to make informed decisions before they invest.

43.     The definition of a "security" under the Securities Act includes a wide range of investment vehicles, including "investment contracts" and "notes."

### B.   The Gemini Earn Program Constituted The Offer And Sale Of "Notes" Securities Under *Reves*

44.    Under Section 2(a)(1) of the Securities Act, the definition of a security includes any "note." *See* 15 U.S.C. § 77b(a)(1); *see also* 15 U.S.C. § 78c. A note is presumed to be a security unless it bears a strong resemblance to instruments that are not securities, which courts determine by examining four factors: (1) the motivation of the parties; (2) the plan of distribution; (3) the expectations of the investing public; and (4) the availability of an alternative regulatory regime that "significantly reduces the risk of the instrument" for investors other than the securities laws, "thereby rendering application of the Securities Acts unnecessary." *See Reves v. Ernst & Young*, 494 U.S. 56, 64-69 (1990). Under *Reves*, the Gemini Earn Agreements were notes, which were offered and sold through the Gemini Earn program as securities.

45.    Genesis offered the Gemini Earn program to obtain crypto assets for the use of its business – namely, to run its institutional lending activities, generate profits for itself, and to pay the interest promised to Genesis investors. Investors in Gemini Earn were primarily motivated by the profit they expected the program to generate.

46.    Genesis controlled the crypto assets it obtained from investors and had complete discretion in determining how much to hold, lend and otherwise use. Genesis used the crypto assets it raised from Gemini Earn investors and other investors to make loans to Institutional Borrowers or as collateral for Genesis's own borrowing. Genesis also had the discretion to hold the assets on its balance sheet to provide Genesis with liquidity to meet potential demand for loans as well as to repay the investors in its crypto asset program.

47.    In turn, investors participated in the Gemini Earn program primarily for profit, *i.e.*, to receive a return on their crypto assets. Gemini and Genesis both touted the profits investors could earn by investing their crypto assets with Genesis, including by advertising Gemini Earn as

an investment and touting that investors could receive up to an 8.05% annual percentage yield on their crypto assets. Investors who purchased the Gemini Earn notes were led to expect that by tendering and giving control over their crypto assets to Genesis, they would receive profit in the form of interest on those assets.

48.     In short, Genesis intended to use the crypto assets for its business and its sole source of revenue, and the Gemini Earn investors were primarily motivated to earn a profit on their crypto assets in the form of interest.

49.     Genesis and Gemini publicly advertised the Gemini Earn Agreements, through Gemini Earn, on websites and on social media. Moreover, the Gemini Earn Agreements were offered and sold to any U.S. investor, including retail investors. As of November 16, 2022, there were approximately 340,000 retail investors, the majority of whom reside in the United States, who had crypto assets invested with Genesis through the Gemini Earn program. The Gemini Earn Agreements were offered and sold to a broad segment of the general public.

50.     Genesis and Gemini, through websites and social media, promoted Gemini Earn as an investment, specifically as a way to earn high "returns" or "yield" on investors' crypto assets. Gemini repeatedly described Gemini Earn as an investment on its own website and social media, and repeatedly touted that the Gemini Earn interest rates were "among the highest rates on the market" and "higher than most existing options." Gemini's website further claimed that Gemini Earn investors could "receive more than 100x the national interest rate." Gemini's website also included a calculator that showed a user potentially how much interest they could earn by investing their crypto assets in the Gemini Earn program for a period between one and four years. The economic realities of the transaction, in which investors had an opportunity to tender crypto assets with Genesis in exchange for earning interest at some of the "highest rates" available for crypto

assets, further underscore why the investing public considered the Gemini Earn program to be an investment opportunity.

51. No alternative regulatory scheme or risk-reducing factors existed to protect investors with respect to the Gemini Earn program. In its own FAQs, Genesis noted that: "[D]igital assets are not covered by SIPC insurance"; "[e]stablishing a lending and borrowing relationship with Genesis is not the same as opening a depository account or a savings account"; and "[a]ccounts with Genesis do not enjoy FDIC protection." Although Genesis has registered as a money services business ("MSB") with FinCEN, the anti-money laundering and recording keeping and reporting requirements of an MSB – designed to prevent money services businesses from being used to facilitate money laundering and the financing of terrorist activities – do not provide the significant disclosures and other investor protections afforded by the federal securities laws.

52. Similarly, although Gemini is registered with NYSDFS as a New York limited purpose trust company, NYSDFS does not have oversight over Genesis. Gemini publicly stated that Gemini Earn does not operate like a traditional bank account, is not protected by a governmental program, and is not backed by Gemini itself. In a February 2021 press release launching Gemini Earn, Gemini stated that "Gemini Earn is not a depository account. . . . Loans are not insured by Gemini or any governmental program or institution." Similarly, on its website, Gemini noted that "Gemini Earn is structured similarly to non-deposit services offered by financial institutions and not insured by FDIC, SIPC, any other governmental program, or Gemini."

53. Any capital reserve requirements applicable to Gemini did not apply to Genesis or to the crypto assets tendered to Genesis through Gemini Earn.

54. Under the terms of the Gemini Earn Agreement, Genesis was not required to post collateral. Gemini told investors that "[a]ll lending by you through our Program will be on an unsecured basis. We will not collect or hold collateral from Borrowers, nor maintain any collateral

account for your benefit." Although Genesis later provided some collateral to Gemini in August 2022, the collateral Genesis provided to Gemini was in the form of restricted shares that could not be liquidated immediately and amounted to only a fraction of the total investor assets held in Gemini Earn.

55.     The lack of an alternative regulatory scheme is evidenced by the current state of Gemini Earn. Since November 16, 2022, investors have been unable to access their crypto assets or any form of collateral. Thus, any oversight of Genesis as an MSB and Gemini as a limited purpose trust company did not adequately reduce the risk of significant harm to Gemini Earn retail investors.

### C.    The Gemini Earn Program Constituted The Offer And Sale Of "Investment Contract" Securities Under *Howey*

56.     A security includes an investment contract, which is an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial or managerial efforts of others. Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946). According to the Supreme Court, the broad definition of "security" is "sufficient to encompass virtually any instrument that might be sold as an investment," because "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called." *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (citations and internal quotation marks omitted) (emphasis in original). Courts have found that novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, and enterprises that exist only on the internet, including crypto assets.

Case 1:23-cv-02027-LJL    Document 25-1    Filed 04/07/23    Page 17 of 29

57.     The offer and sale of Gemini Earn Agreements through the Gemini Earn program constituted the offer and sale of investment contracts under *Howey*.

58.     The Gemini Earn program involved an investment of money. Between February 2021 and November 2022, Genesis raised billions of dollars from hundreds of thousands of retail investors, who tendered crypto assets to Genesis through the program.

59.     Investors in Gemini Earn invested in a common enterprise with other investors and with Defendants. Specifically, Genesis pooled Gemini Earn investors' and other investors' crypto assets on Genesis's balance sheet, and used those assets in order to generate returns for both Genesis and investors, including Gemini Earn investors. Genesis did not manage individual or separate accounts for each investor in Gemini Earn. Instead, the returns earned by each investor were reliant on the pooling of the invested crypto assets. As the invested crypto assets were not segregated in any way by Genesis, each investor's fortune was tied to the fortunes of the other investors.

60.     Gemini Earn investors' fortunes were also tied to Genesis's fortunes; both Genesis and Gemini Earn investors earned profits when Genesis deployed the pooled assets. As part of the Gemini Earn Agreements, investors ceded control over their crypto assets to Genesis, who had complete discretion in deploying the crypto assets. Genesis, not investors, undertook various complex tasks of pooling Gemini Earn crypto assets, identifying Institutional Borrowers to serve as counterparties, negotiating individual agreements with those counterparties, and managing market and counterparty risk. Investors understood that Genesis would conduct due diligence on Institutional Borrowers and evaluate market conditions in determining the appropriate collateral levels. Genesis undertook these efforts in order to generate maximum profit for itself, which in turn determined the success of the common enterprise and the fortunes of investors in the Gemini Earn Program. This reliance on Genesis's deployment of the pooled assets in a common enterprise

is demonstrated by investors' current predicament, whereby Genesis has experienced withdrawal requests that exceed its current liquidity, and has consequently restricted Gemini Earn investors from withdrawing their crypto assets and begun a restructuring process.

61.     From its inception, Gemini and Genesis both explicitly marketed the Gemini Earn program as an investment opportunity, which led investors to reasonably expect to profit from Genesis's efforts. As detailed above, through their websites and social media channels, both Genesis and Gemini publicly touted the ability for investors to earn yield or returns via Gemini Earn. On its website, Gemini repeatedly described  Gemini Earn as an investment; repeatedly touted that the Gemini Earn interest rates were "among the highest rates on the market" and that Gemini Earn investors could "receive more than 100x the national interest rate"; and illustrated how much interest Gemini Earn investors could potentially earn by investing their crypto assets for a period between one and four years.

62.     Genesis also described itself as the "premier institutional digital asset financial services firm," and "the world's largest digital asset lender" and that "[h]olders of digital currencies can earn yield on their assets by lending directly to Genesis, a regulated and trusted counterparty." Accordingly, Gemini Earn investors were led to expect that Genesis's efforts to generate investment returns would in turn result in profit for investors.

63.     Investors understood that, on a monthly basis, the interest rate for their Gemini Earn investments would be revised by Genesis, reflecting Genesis' ongoing managerial efforts to pay among "the highest rates in the market."

64.     The above statements and actions, and the economic reality of the Gemini Earn program, led reasonable investors to expect Genesis to undertake significant and essential technical, managerial, and entrepreneurial efforts on their behalf, and investors in the Gemini Earn program reasonably expected to profit from those efforts.

**D.    Defendants Failed To Register With The SEC Their Offer And Sale Of Securities Through The Gemini Earn Program**

65.    Defendants offered and sold securities through the Gemini Earn program.

66.    Defendants have used interstate commerce to offer and sell securities through Gemini Earn by, among other things, engaging in general solicitation through their websites and other promotional materials, including social media.

67.    Defendants have never had a registration statement filed or in effect with the SEC for their offers and sales of securities through the Gemini Earn program. Nor were the securities subject to any exemption from registration.

68.    As a result, Gemini Earn investors had limited or inadequate information about Genesis's operations, financial condition, liquidity, or other factors relevant in considering whether to invest in the Gemini Earn program. Investors also lacked full and detailed information regarding how Genesis deployed their crypto assets, including its exposure to volatility in crypto asset markets, the financial condition of Genesis's counterparties and the amount of collateral Genesis obtained, if any, as part of its loans to Institutional Borrowers. In short, Gemini Earn investors lacked information that issuers are required to provide under the Securities Act when they solicit public investment.

**V.    DEFENDANT DCG IS A "CONTROLLING PERSON" UNDER THE SECURITIES ACT WITH RESPECT TO GENESIS**

69.    At all relevant times, DCG possessed, directly and indirectly, the power to direct or cause the direction of the management and policies of Genesis and to influence and control all aspects of Genesis's operations, and in fact exercised that power throughout the Class Period.

70.    Genesis is one of several companies that DCG operates under the "Genesis" brand.

71.    At all relevant times, Genesis was a wholly owned subsidiary of DCG.

72.     During the Class Period, Genesis and DCG shared an office address at 250 Park Avenue South, 5th Floor, New York, New York 10003.

73.     During the Class Period, DCG entered into several transactions with Genesis that reflect DCG's control of Genesis.

### A.     DCG Caused Its Subsidiary Genesis To Extend $575 Million In Loans To DCG On Non-Arm's-Length And Commercially Unreasonable Terms

74.     DCG's control of Genesis is reflected in the events that occurred in relation to an investment product, Grayscale Bitcoin Trust ("GBTC"), offered by another of DCG's subsidiaries, Grayscale Investments, LLC ("Grayscale").

75.     Grayscale is a subsidiary of DCG and is a digital asset management company that offers investment products providing exposure to the price movement of various digital currencies. Grayscale's most popular investment product is GBTC, a publicly traded investment vehicle managed by Grayscale that provides exposure to Bitcoin's price movements without the need to directly buy and hold Bitcoin itself. GBTC is traded on OTCQX, a market for over-the-counter securities.

76.     GBTC shares can be acquired in two ways: (1) anyone with a brokerage account can buy GBTC shares in the over-the-counter securities markets; and (2) investors can subscribe to the trust underlying GBTC shares (the "Trust"). Subscribing to the Trust requires a minimum investment of $50,000 and is available only to accredited investors. Trust subscribers receive GBTC shares representing the value of Bitcoin held in the Trust equal to the amount invested by the subscriber. GBTC shares issued via subscriptions are subject to a six-month lockup period during which subscribers cannot sell their shares. Once the lockup period ends, GTBC subscribers are free to sell their GBTC shares.

Case 1:23-cv-02027-LJL   Document 25-1   Filed 04/07/23   Page 21 of 29

77. Grayscale charges a 2% management fee for its management of the Trust. As of December 26, 2022, GBTC had $10.6 billion assets under management, which would generate $200 million in fees for Grayscale (and, indirectly, its parent DGC) annually.

78. Until February 2021, GBTC shares traded at a premium to the net value of the assets ("NAV") held by GBTC. The premium was caused by the fact that GBTC was the only way for institutional investors to get regulator-approved access to Bitcoin's price movements, which caused demand to exceed supply.

79. Traders sought to exploit the existence of the premium by subscribing to the Trust and selling their GBTC shares at a premium once the six-month lockup period expired. This trade, known as the "Grayscale Trade," was extremely successful, and it became a cornerstone of the digital asset investing strategies of many digital asset-focused hedge funds and lending firms.

80. However, commencing in approximately February 2021, GBTC stopped trading at a premium to its underlying NAV. What was once a premium to NAV began to reverse, and now became a discount. By late 2021 and throughout 2022, the discount of the price of GBTC shares relative to GBTC's NAV continued to increase. For example, on November 30, 2021, GBTC shares were trading at a 12.05% discount to the Trust's NAV. By November 16, 2022, GBTC shares were trading at a 39.29% discount to the Trust's NAV.

81. The steady decline in GBTC's price caused financial stress on DCG, the parent of Genesis. Specifically, it decreased the attractiveness of GBTC as an investment, thereby decreasing the management fees that DCG (through Grayscale) stood to earn from managing the Trust. The decrease in price of GBTC also decreased the value of the GBTC shares that DCG held on its balance sheet and that DCG itself used as collateral in financing transactions.

82. To alleviate this financial pressure, DCG caused its subsidiary Genesis to execute a number of non-arm's-length and commercially unreasonable loan transactions. Under these loans,

Case 1:23-cv-02027-LJL Document 25-1 Filed 04/07/23 Page 22 of 29

Genesis loaned a total of approximately $575 million to DCG, consisting of a loan to DCG in the principal amount of approximately $200 million due on May 9, 2023, a loan to DCG in the principal amount of approximately $300 million due on May 11, 2023, and a loan to an affiliate of DCG in the principal amount of 4,550.45 Bitcoin (valued at approximately $75 million) due on May 11, 2023. DCG used the $575 million, in part, to purchase more GBTC shares, hoping that GBTC shares would suddenly reverse their price trend and appreciate.

83.     In a note to shareholders of DCG sent on November 22, 2022 ("November 22, 2022 Note"), Barry Silbert, the founder and CEO of DCG, stated that, "[f]or those unaware, in the ordinary course of business, DCG has borrowed money from Genesis Global Capital in the same vein as hundreds of crypto investment firms." Silbert claimed that the loans in the amount of $575 million were "used to fund investment opportunities and to repurchase DCG stock from non-employee shareholders."

**B.      In The Summer Of 2022, DCG Entered Into A Transaction With Genesis To Facilitate Genesis's Efforts To Conceal Its Insolvency**

84.      One of the most significant impacts of the widening GBTC discount was the impact on hedge funds who had borrowed extensively and were over-leveraged against the value of their assets, including GBTC shares.

85.      One of the most prominent and prolific borrowers was digital asset investment firm Three Arrows Capital ("3AC"), who at one point had over $10 billion assets under management. In June 2022, facing margin calls from several lenders due to declining digital asset prices, 3AC became unable to meet its liabilities. On June 27, 2022, 3AC was ordered by a British Virgin Islands court to liquidate its assets after defaulting on several debts and being sued by its creditors. On July 1, 2022, 3AC filed for Chapter 15 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.

Case 1:23-cv-02027-LJL   Document 25-1   Filed 04/07/23   Page 23 of 29

86.     3AC's bankruptcy filings revealed 3AC owed Genesis $2.3 billion, and that 3AC possessed assets which at the time were generously valued at approximately $1 billion.

87.     Because 3AC also owed other creditors billions of dollars, it was immediately clear that Genesis would not recover any amount close to the $2.3 billion that it was owed by 3AC. This should have resulted in an immediate recognition of a substantial impairment of the 3AC debt on Genesis's books equal to nearly the full $2.3 billion.

88.     Instead, Genesis improperly maintained that 3AC's $2.3 billion debt to Genesis was still worth $1.1 billion. To maintain this fiction, Genesis then "sold" its rights under the $1.1 billion debt to its parent company, DCG, in exchange for a promissory note for $1.1 billion due in 10 years. As later described by DCG CEO Silbert in the November 22, 2022 Note, "DCG stepped in and assumed certain liabilities from Genesis related to the Three Arrow Capital default."

89.     DCG's assumption of the $1.1. billion debt from Genesis was not an arm's-length transaction. No independent party negotiating at arm's-length with Genesis at that time would have valued 3AC's debt to Genesis at $1.1 billion. The loan to 3AC was uncollectable.

90.     The purpose of the above debt acquisition by DCG was to conceal the fact that Genesis had improperly and imprudently loaned billions of dollars to 3AC and that 3AC's bankruptcy had caused the value of Genesis's own liabilities to its creditors to exceeds its assets, *i.e.*, that Genesis itself had become insolvent. As a result of this sham transaction, DCG was able to facilitate Genesis's continued operations and its continued receipt of investments from Gemini Earn investors pursuant to the Gemini Earn Agreement. Specifically, this transaction allowed Genesis to (falsely) represent, pursuant to Section 5 of the agreement, that it was still solvent, and that "there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder."

Case 1:23-cv-02027-LJL   Document 25-1   Filed 04/07/23   Page 24 of 29

91.     As part of these efforts to facilitate Genesis's continued operations, including its receipt of investments from Gemini Earn investors, on July 6, 2022, then-CEO of Genesis, Michael Moro, posted a tweet stating: "DCG has assumed certain liabilities of Genesis related to [3AC] to ensure we have the capital to operate and scale our business for the long-term." This statement was misleading because, in reality, DCG had *not* ensured that Genesis had the "capital to operate." Under the $1.1 billion promissory note transaction, DCG did not inject any new capital or liquidity into Genesis. Instead, the entire transaction was merely designed to create the impression that Genesis was still solvent. Although DCG was tagged in the Twitter post, no representative of DCG took any affirmative steps to correct the misstatement.

92.     Within Genesis and DCG, multiple employees repeated the same messaging concerning the effect of DCG's $1.1 billion promissory note transaction. For example, also on July 6, 2022, Matthew Ballensweig, Genesis's then-Head of Trading and Lending, emailed a document titled "Three Arrows Post-Mortem" to multiple Gemini employees, who were responsible for managing aspects of the Earn program. The section of this document labeled "Key Facts" stated: "Losses predominantly absorbed by and netted against DCG balance sheet, leaving Genesis with adequate capitalization to continue [Business As Usual]."

## CLASS ACTION ALLEGATIONS

93.     Plaintiff brings this action as a class action pursuant to N.Y. C.P.L.R. § 901, on behalf of the Class, who invested in the "Gemini Earn" program offering (the Offering) conducted between approximately February 2021 and November 2022 (the Class Period), and who were damaged thereby. Excluded from the Class are Defendants and their families; the officers, directors and affiliates of Defendants, and the members of their immediate families; and Defendants' legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

Case 1:23-cv-02027-LJL   Document 25-1   Filed 04/07/23   Page 25 of 29

94.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class. The members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this Action.

95.     Plaintiff's claims are typical of the Class because Plaintiff's and the Class members' claims and damages arise from the same illegal Offering.

96.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

97.     There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class members. Among the questions of law and fact are:

    a.   whether investments in the Gemini Earn program constituted securities under the Securities Act;

    b.   whether the Offering was an illegal, unregistered securities offering that violated the Securities Act;

    c.   whether Defendant DCG was a controlling person vis-à-vis Genesis; and

    d.   to what extent the members of the Class have sustained damages.

98.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

Case 1:23-cv-02027-LJL  Document 25-1  Filed 04/07/23  Page 26 of 29

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF SECTIONS 5 AND 12(a)(1) OF THE SECURITIES ACT
### (Against Defendant Gemini)

99.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

100.     This Count is brought pursuant to Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e and 77l(a)(1), against Defendant Gemini.

101.     The investments in the Gemini Earn program are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

102.     Defendant Gemini promoted, offered, solicited offers to buy, and/or sold securities in the Offering.

103.     No Defendant or other person filed with the SEC a registration statement for the offer and sale of the securities offered and sold through the Offering, no registration statement was in effect at the time of the Offering, and no exemption to the registration requirement was available.

104.     Defendant Gemini used the instrumentalities of interstate commerce in connection with the offer and sale of the securities.

### COUNT II
### VIOLATION OF SECTION 15 OF THE SECURITIES ACT
### (Against Defendant DCG)

105.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

106.     This Count is asserted against Defendant DCG under Section 15 of the Securities Act, 15 U.S.C. § 77o.

107.    Non-party Genesis violated Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e and 77l(a)(1) by selling investments in the Gemini Earn program, which are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

108.    Defendant DCG, by virtue of its offices, directorships, stock ownership, agency, agreements or understandings, and specific acts was, at the time of the wrongs alleged herein, and as set forth herein, a controlling person vis-à-vis Genesis, within the meaning of Section 15 of the Securities Act.

109.    DCG possessed and possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of Genesis, through the ownership of voting securities, its offices and directorships, by contract, subscription agreement, or otherwise.

110.    In addition to possessing this power and influence over Genesis, DCG in fact exercised this power and influence to cause the unlawful offer and sale of the securities as described herein.

111.    In addition, DCG was a culpable participant in the violation of the Securities Act resulting from the failure to register the Offering. Among other actions, DCG entered into a $1.1 billion promissory note transaction with Genesis to allow Genesis to continue to mislead its investors, including investors in the Gemini Earn program, that Genesis was still solvent. As a result of this conduct, DCG facilitated the continued sale by Genesis of unregistered securities through the Gemini Earn program.

112.    By virtue of the conduct alleged herein, DCG is liable for the wrongful conduct complained of herein and is liable to the Class for rescission and/or damages suffered.

Case 1:23-cv-02027-LJL    Document 25-1    Filed 04/07/23    Page 28 of 29

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Declaring that this action is properly maintainable as a class action under N.Y. C.P.L.R. § 901, certifying Plaintiff as class representative, and appointing his counsel HGT Law and Restis Law Firm, P.C. as Co-Class Counsel;

B.    Declaring that Defendants offered and sold unregistered securities in violation of Sections 5, 12(a)(1) and 15 of the Securities Act;

C.    Awarding Plaintiff and the members of the Class the remedy of rescission of their investment in the Offering, and/or awarding compensatory damages in favor of Plaintiff and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

D.    Awarding Plaintiff and other members of the Class their reasonable costs and expenses incurred in this action, and their attorneys' fees and expert fees;

E.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures; and

F.    Awarding Plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: February 22, 2023

**HGT LAW**

/s/ *Hung G. Ta*
Hung G. Ta, Esq.
JooYun Kim, Esq.
Natalia D. Williams, Esq.
250 Park Avenue, 7th Floor
New York, New York 10177
Tel:     (646) 453-7288
Fax:     (646) 453-7289
Email: hta@hgtlaw.com
          jooyun@hgtlaw.com
          natalia@hgtlaw.com

William R. Restis, Esq.
**RESTIS LAW FIRM, P.C.**
402 West Broadway, Suite 1520
San Diego, CA 92101
Tel: (619) 270-8383
Email: william@restislaw.com

*Attorneys for Plaintiff and
Proposed Class Counsel*